WAGSTAFF & CARTMELL LLP
Austin Brane (SBN 286227)
Mike Cutler (SBN 270663)
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
abrane@wcllp.com
mcutler@wcllp.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| MAXINE FURS OF HOOVER, INC., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GROUNDHOG ENTERPRISES, INC. D/B/A/ MERCHANT LYNX SERVICES, <br><br> Defendant. | Case No.: _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMADED** |

COMES NOW Plaintiff Maxine Furs of Hoover, Inc. ("Maxine Furs") by and through undersigned counsel, on behalf of itself and all persons similarly situated, complains and alleges as follows based on personal knowledge, investigation of counsel, and information and belief.

## I.   **INTRODUCTION**

1.      This case concerns the unlawful business practices of Defendant Groundhog Enterprises, Inc., d/b/a Merchant Lynx Services ("Merchant Lynx" or "Defendant").

2.      Merchant Lynx is a sales organization that acts as a middleman between credit card processors and business merchants.   In this role, Merchant Lynx assessed and seized unauthorized and excessive fees from its merchant clients, often small businesses.

3.      Merchant Lynx promises merchants a simplified 'flat rate' fee for card payment processing.  Merchant Lynx provides merchants with a seemingly straightforward application and fee schedule to persuade merchants to sign up, sometimes for long-term contracts.

4.      Once merchants sign up, however, Merchant Lynx begins furtively charging a host of unauthorized, undisclosed, and unnegotiated fees.  Merchant Lynx combines these unauthorized fees (in the form of fee increases and new fees) with legitimate costs associated with credit card processing services, rendering them undetectable by unsuspecting merchants.

5.      Debit and credit card payment processing logistics can be complicated such that merchants (especially smaller or unsophisticated merchants) can find it very difficult to understand exactly how and how much they will be charged for processing services.

6.      As such, merchants rely on the companies that provide payment processing services to provide them with transparent and appropriate terms.  Merchants need and expect clear, up-front explanations about the costs and fees associated with the card payment process so that merchants can anticipate and plan for those costs in managing their business.

7.      Fees for such services are generally the fourth highest expense for merchants, following rent, labor, and product costs, so clarity about the pricing and rates associated with card payment processing is vital.  Avoiding frequent payment service provider changes is also important to avoid added costs and business disruption.  Early termination fees may also apply. (Merchant Lynx, for example, assesses a $495 early cancellation fee.)

8.      Communications about fee terms are often made by Independent Sales Organizations, like Merchant Lynx, not payment processors.  It is often in the ISO's best interest to keep merchants in the dark.

9.      Merchant Lynx took advantage of its position as an intermediary for merchants in this complex ecosystem to entice merchants, like Maxine Furs, to execute standardized "Merchant Agreements" that appeared to set forth straightforward, transparent fee schedules and pricing rates.

10.     Merchant Lynx presents merchants with one document, the short and simplified "Merchant Agreement," that plainly states the fees the merchant will be charged.

11.     After merchants sign the contracts and the parties begin to do business, Merchant Lynx unilaterally increases the fees or adds new fees.  Merchant Lynx then seizes the charged amounts from merchant bank accounts, often before merchants even receive billing statements.

12.     When challenged about a unilateral decision to raise fees or impose new fees on merchant accounts, Merchant Lynx relies on another document—its Terms—to suggest it is authorized to assess additional, hidden fees, hike up fee rates, and ultimately conceal the actual costs of the card processing services and Merchant's Lynx's fees.

13.     In this way, merchants see and execute one document that clearly displays the agreed-on rates and fees, but are purportedly bound by another document that attempts to erase or undo all of those terms.  In other words, Merchant Lynx attempts to use the fine print Terms to surreptitiously alter the agreed-on fees and rates that were in fact reviewed and approved by the merchant.

14.     Merchant Lynx also tried to use the Terms to shield itself from liability if the merchant discovers and raises an issue with Merchant Lynx's deviation from the agreed-on

pricing.   Such provisions are illusory, lack mutuality, violate public policy, and are unconscionable.

15.     Merchant Lynx also designs merchants' monthly billing statements to conceal its fee increases and new fees.  Line items fees are named differently on the statement than on the initial fee schedule that merchants sign.  Some fees are bundled together with others, with no explanation given for the consolidation.  Merchant Lynx also uses vague and/or deceptive language to suggest fee increases or new fees aren't unilaterally imposed by Merchant Lynx.

16.     In truth, Merchant Lynx assesses such mark-ups for the sole purpose of increasing its own profits at the merchant's expense.

17.     For many years, Defendant has perpetrated such unlawful deception.  Upon and information belief, Defendant continues to do so.  This case challenges those overbilling practices.

II.     **THE PARTIES**

18.     Plaintiff Maxine Furs of Hoover, Inc. ("Maxine Furs") is an Alabama corporation that specializes in the design, cleaning, repair, and storage of furs.  It is owned and operated by John Pechi and is located in Hoover, Alabama.  Maxine Furs began doing business with the Defendant in October 2020.

19.     Defendant Groundhog Enterprises, Inc. d/b/a Merchant Lynx Services ("Merchant Lynx") is a Georgia corporation with its principal place of business in Florida.

20.     Merchant Lynx is a registered Independent Sales Organization ("ISO") of Esquire Bank, National Association ("Esquire Bank").

21.     Esquire Bank is a wholly-owned subsidiary of Esquire Financial Holdings, Inc., a registered financial holding company in Jericho, NY.

22.     Merchant Lynx was an Independent Sales Organization ("ISO") of Westamerica Bank.

23.     Westamercia Bank is a commercial and regional community bank headquartered in San Rafael, CA.

## III.   <u>JURISDICTION AND VENUE</u>

24.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a different state than Merchant Lynx.

25.     This Court has personal jurisdiction over Merchant Lynx because Merchant Lynx consented to suit in this jurisdiction in Section 7.2(B) of its Terms, identifying the U.S. District Court for the Northern District of California as its chosen forum.

26.     Venue and jurisdiction are proper in this Court pursuant to Section 7.2(B) of Merchant Lynx's Terms which mandates that the litigation of disputes related to the Merchant Agreement and additional Terms occur in the "United States District Court for the Northern District of California" as the "exclusive jurisdiction and venue."  Both parties contracted that any action related to that agreement be "governed by California law" and agreed that "all performances and transactions under this Agreement will be deemed to have occurred in California."

## IV.     COMMON FACTUAL ALLEGATIONS

### A.     The Debit and Credit Card Payment Processing Industry

27.     Most merchants take payments for goods and services via debit and credit cards. To do so, a merchant must use card payment processing services that access the financial network that accepts this method of payment.

28.     Card Associations (commonly referred to as credit card companies or networks) like Visa and Mastercard operate to clear transactions between banks and operate as a governing or administrative body over the processes related to credit card transactions.  The association rules outline some of the responsibilities of each of the players in the industry, including banks, ISOs, and payment processors.

29.     All debit and credit card transactions get processed through card associations, e.g. Visa and Mastercard, which is known as the interchange.

30.     Independent banks issue credit and debit cards to consumers that can be used at merchant locations, subject to rules the card associations promulgate.

31.     Credit card payment processors reconcile debit and credit card transactions, process payment through the card network, and ensure that the appropriate accounts are debited and credited.

32.     Independent Sales Organizations (ISOs) market and sell credit card processing services provided by a credit card processor.  Merchant Lynx is an ISO.

33.     ISOs seek out business merchants who wish to accept credit and debit cards.  ISOs then form contracts with merchants to connect them to a credit card processor and/or bank.

CLASS ACTION COMPLAINT

34.   The parties involved in the payment processing services industry can be summarized as follows:

(a).   <u>The Card Issuer</u> – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase or Bank of America, and may charge a fee whenever a customer uses one of its cards for a transaction.  These companies charge fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.20/transaction).  These fees vary based on the type of card used.  For example, the card issuing companies may charge a higher fee for transactions involving a rewards credit card than a card with no rewards program.  These fees are generally known as "interchange rates."

(b).   <u>The Card Association</u> – the card associations (i.e., Visa, Mastercard, and Discover) also charge per transaction fees.  By way of example, Visa assesses a fee known as the "APF" ("Acquirer Processing Fee"), and Mastercard charges a fee known as the "NABU" ("Network Access Brand Usage") fee.  The card networks also charge various additional fees depending on the type of transaction.  These fees are generally known as "assessments."

(c).   <u>The Payment Processor</u> – this is the entity that actually processes the payment through the card network and ensures that whenever a customer pays for an item or service with a credit or debit card, the customer's account is debited, and the merchant's account is credited. Upon information and belief, Merchant Lynx has used Esquire Bank itself, as well as TSYS and Fiserv, formerly First Data Merchant Services Corporation, as its payment processors. (Merchant Lynx previously used iPayment, Inc. as its payment processor, but iPayment and its affiliate company Paysafe Payment Processing Solutions, LLC sued Merchant Lynx in January 2020 for allegedly stealing Paysafe's clients.)

(d).    <u>The Acquiring Bank (or Merchant Bank)</u> – only banks may be members of card associations.   These acquiring or member banks "sponsor" merchant acquirers and payment processors so they may process transactions through the card associations.   For the relevant class period, Esquire Bank, National Association ("Esquire Bank") has been Merchant Lynx's acquiring bank.   According to Esquire Bank's 2021 Annual Report, the Bank "provides payment processing services as an acquiring bank through the third-party or ISO business model in which we process credit, debit card, and ACH transactions on behalf of merchants."[1]

(e).    <u>Independent Sales Organization (or Merchant Acquirer)</u> – the merchant acquirer or independent sales organization ("ISO") is the company that markets the payment processor's services to merchants.   They essentially act as a "middleman" between merchants and payment processors and enroll merchants in payment processing services.   ISOs or merchant acquirers usually work with independent sales agents who sign up merchants.   The ISO or merchant acquirer then pays the agent based on a percentage of the processing fees obtained from "their" merchants.   Merchant Lynx is an ISO or merchant acquirer and works with independent sales agents to sign up merchants on its behalf.   These agents are not employees of Merchant Lynx. They are independent contractors.

35.    Ordinarily, a merchant that desires to accept credit and debit cards as a form of payment reaches an agreement with an ISO (or its independent sales affiliates) to obtain such

---

[1]   Esquire   Financial   Holdings   2021   Annual   Report;   accessed   Oct.   25,   2022:
https://www.annualreports.com/HostedData/AnnualReports/PDF/NASDAQ_ESQ_2021.pdf

CLASS ACTION COMPLAINT

services.  The parties agree on the total fees that the merchant will be charged, which commonly consist of three parts:

(a). <u>"Pass-through" Costs</u> – these charges consist of fees imposed by card issuers and the assessments imposed by card associations.  These are set costs incurred by the member bank that apply universally at any given time, regardless of the type or amount of the transaction or the identity of the merchant.  These costs are set, unavoidable, and are "passed through" to the merchant.

(b). <u>Payment Processing Fees</u> – these are the fees which the merchant is charged by the payment processor for the payment processing services.  These fees are not uniform but can be varied or negotiated by the parties; however, each payment processor often has an established processing charge on a per transaction and/or percentage of volume basis.

(c). <u>Middleman Fees Representing Additional Mark-up Charged by the ISO</u> <u>("Middleman Fees")</u> –  these are the fees the merchant is charged by the ISO or Merchant Acquirer. Middleman Fees are not uniform but can be varied or negotiated by the parties.  Often the Payment Processing Fees and the Middleman Fees are presented together, as one fee.  Or, the Payment Processing Fees, Middleman Fees, and Pass-through Costs may all be presented together, as a single fee.

**B.**     **The Merchant Lynx Business Model**

36.     Founded in 2006, Groundhog Enterprises, Inc., d/b/a Merchant Lynx Services, is an Independent Sales Organization (ISO) that provides credit and debit card processing services to an array of businesses and merchants nationwide.

37.     Merchant Lynx is in direct contact with merchants, and acts as an intermediary between merchants and the credit card processor.

CLASS ACTION COMPLAINT

38.     Merchant Lynx principally relies on a network of independent sales agents to market and sell card payment processing services to merchants.

39.     Merchant Lynx markets itself as a straightforward, merchant-friendly alternative for those seeking to simplify their payment processing services.  According to their website, Merchant Lynx helps "clients manage payment data in value-added ways that allow them to operate more effectively," and the company prides itself "on transparency and doing what we say we'll do."[2] As one header reads: "OUR WORD IS OUR BOND."[3]

40.     Such transparency, according to Merchant Lynx, is accomplished by providing merchants "reporting tools that make it easy to access important information in real time," a process that is "streamlined for optimal speed, convenience, and efficiency."[4]

41.     Merchant Lynx, like other ISOs, makes money by charging Middleman Fees. These fees may be monthly, per transaction, or as a percentage of the individual transactions.

42.     For example, Merchant Lynx may charge 0.2% of the sales volume for each purchase a customer makes from the merchant with a Mastercard credit card, 20 cents per transaction, and $15/month.  If the purchase was for $1000, the merchant's fees would be $2.00

---

[2] Merchant Lynx "About" page; accessed Dec. 8, 2022: https://merchantlynx.com/about/
[3] Merchant Lynx "About" page; accessed Dec. 8, 2022: https://merchantlynx.com/about/
[4] Merchant Lynx "Solutions" page; accessed Dec. 8, 2022: https://merchantlynx.com/solutions/

CLASS ACTION COMPLAINT

($1000.00 * .002 = $2.00), plus $0.20 per transaction, plus $15, as demonstrated below. In this example, the merchant with a single transaction for $1000 would pay $17.20 in total fees.

| % of Sales Volume | $2.00 |
|---|---|
| Per Transaction | $0.20 |
| Monthly | $15.00 |
| | |
| Total ISO Fees | $17.20 |

43.     Merchant Lynx's Middleman Fees are charged in addition to the Pass-through Costs and Payment Processor Fees described above.

44.     Pass-through Costs can vary based on a variety of factors including transaction type, location, association fees, card type, etc.  Given the high-volume of retail purchases made with credit or debit cards, line item statements for payment processing services can be lengthy and difficult to understand, with many different fee categories, rates, and other variables.

45.     Under the guise of simplifying the transactional information, Merchant Lynx groups Pass-through Costs, Payment Processing Fees, and/or Middleman Fees together on the merchant statement. This process creates a shorter statement, but also prevents merchants from seeing exactly what fees are being assessed and the nature of those fees on a transaction-level basis.

46.     Despite promises of transparency and streamlining, Merchant Lynx's Middleman Fees are not fully disclosed.  Merchants cannot easily tell when and how Merchant Lynx is raising and adding new fees in violation of the contractual terms.

**C.     Merchant Lynx's Merchant Agreement Appears to Offer a Straightforward, Transparent Flat Rate**

47.     Upon information and belief, Merchant Lynx trains sales agents to pitch Merchant Lynx as a hassle-free service without any hidden fees or catches.

48.     Agents offer merchants a supposed "flat rate" plan that promises transparency and predictability for card payment processing fees. This single, all-inclusive rate is characterized by agents as a cost-saving, efficiency-boosting alternative for merchants that will better estimate what processing services will cost.

49.     When an independent sales agent of Merchant Lynx signs up a new merchant, they provide that merchant with what is known as the "Merchant Application and Agreement" (or "Merchant Agreement").

50.     The Merchant Agreement is a three-page document that includes basic information about the merchant and its principal, as well as two signature pages, one of which contains a "Fee Schedule."

51.     The Fee Schedule contains the merchant's fee options.



52.     Merchants agree to a Discount Fee, a Transaction Fee, and other "Miscellaneous" Fees.

53.    For their Discount Fees, merchants can elect to pay based on a "Tiered" or "Interchange Plus" basis.  Both Discount Fee options result in the merchant being charged a percentage of the sales volume.

54.    Under the "Tiered" payment structure (referred to in the Merchant Lynx Merchant Agreement as the "Qualified Credit Card Discount Rate") merchants agree to pay a specified amount for each type of card transaction with that amount being calculated as a percentage of a transaction.  The merchant agrees to a set rate for each of the 3-4 tiers of transaction types.  ISOs can elect to charge one rate for all of the tiers or a different rate for each of the tiers.

55.    The second option, "Interchange Plus" (referred to in the Merchant Lynx Merchant Agreement as "Pass Thru I/C Plus"), results in the merchant being charged the Pass-through Costs from interchange, plus an additional amount specified in the contract.

56.    In addition to Discount Fees, merchants can also negotiate their Transaction Fees. Transaction Fees are established dollar amounts (e.g. 10 cents) assessed on each credit card transaction.  These fees are sometimes also referred to an authorization fee.

57.    Thus, for each credit card transaction, the merchant is charged a fee that is an agreed percentage of the sales volume ("Discount Fee") and a per transaction fee ("Transaction Fee").

58.    Merchants may also agree to other "Miscellaneous" fees. The Merchant Lynx Application and Agreement included references to some of the following Miscellaneous fees:

- Monthly Minimum Fee (negotiated)
- Customer Service Fee (negotiated)
- Batch Fee (negotiated)
- Chargeback Fee ($35)
- ACH Retrieval Fee ($15)
- Govt. Compliance Fee ($4.95)

CLASS ACTION COMPLAINT

- Fee TIN Mismatch Fee ($35)
- Gateway Fee ($10)
- PCI Non-compliance Fee ($30)
- Annual Fee ($159)
- ACH Reject Fee ($25)
- Early Termination Fee ($495)
- Voice Auth Fee ($1.50/transaction)
- Online Reporting Fee ($15.95)
- Annual PCI Fee ($159)
- Wireless Fee ($15)
- AVS Fee ($0.10)

59.     That the Merchant Agreement contains only a single, small box on one page detailing the Fee Schedule gives the impression that merchants need only consult the Merchant Agreement's Fee Schedule to determine the costs associated with Merchant Lynx's card payment processing services.

60.     Merchant Lynx uses the same tack in its short, standardized "Merchant Information" form.  On that form, the "Current Rate" merchants pay with their current service provider is compared to Merchant Lynx's "Offered Rates," which includes just five lines detailing the "Flat Rate," the "Interchange Rate or Cash Discount," the "Per Transition" amount, the "Statement Fee $," and the "Batch Fee $."

> **Offered Rates:**
>
> - Flat Month Rate $_____
> - Interchange Rate or Cash Discount _____ %
> - Per Transition _____ Cents
> - Statement Fee $_____
> - Batch Fee $_____

61.     This short, standardized Merchant Agreement and Merchant Information form is meant to convey to merchants that their card processing service fees will be greatly simplified, displaying in an uncomplicated template the alleged savings that will be delivered to merchants who sign up with Merchant Lynx.

**D.     Merchant Lynx Unilaterally Increases Fees and Imposes New Fees After the Contract is Executed**

62.     Only a few months after merchants enter long-term contracts and invest hundreds (if not thousands) of dollars in the software and equipment required by the new processor, Merchant Lynx starts unilaterally increasing and imposing new unauthorized fees.

63.     Indeed, Merchant Lynx increases the Discount Fees, Transaction Fees, and other fees that are supposed to be passed through to merchants at cost.

64.     To the extent these new fees appear on the merchant statements at all, they are combined with other fees and are lumped in with other charges, avoiding detection.

65.     For example, merchants contract for a set Transaction Fee (e.g. 10 cents per transaction).  Merchant Lynx charges that set rate for a few months, then it unilaterally raises the rate a few cents (e.g. to 12 cents per transaction).  Then a year or so later, Merchant Lynx unilaterally raises the fee a few more cents (e.g. to 15 cents per transaction).  Eventually, merchants are being charged far in excess of the contracted rate, sometimes as much as double the amount set forth in the Merchant Agreement.

66.     Merchant Lynx applies the same practices to its Discount Rates.  Merchants would contract for set Interchange Plus rates (e.g. Interchange, plus 0.20% of sales volume).  After a

few months, Merchant Lynx would start charging the merchants additional basis points (e.g. Interchange, plus 0.25% of sales volume).

67.     For Tiered customers, these increases would be wrapped into their tiered rate. So, if merchant contracted for fees at 0.50% of sales volume for all tiers, Merchant Lynx would charge that rate for a few months.  Then, Merchant Lynx would start charging more for one or more of the tiers.  In this example, the increase might be to 0.65% of sales volume.

68.     Merchant Lynx continues this practice of increasing the Discount Fees and Transaction Fees in excess of the terms agreed to in the Merchant Agreement throughout the life of the contract.

69.     Upon information and belief, Merchant Lynx also increased other fees listed in the Merchant Agreement or imposed completely new fees, including the following:

- Monthly Minimum Fee
- Customer Service Fee
- Batch Fee
- Chargeback Fee
- ACH Retrieval Fee
- Govt. Compliance Fee
- Fee TIN Mismatch Fee
- Gateway Fee
- PCI Non-compliance Fee
- Annual Fee
- ACH Reject Fee
- Early Termination Fee
- Voice Auth Fee
- Online Reporting Fee
- Annual PCI Fee
- Wireless Fee
- AVS Fee

70.     Merchant Lynx knows that if they disclosed these fees in the Merchant Agreement or on the front end of the relationship, merchants would be much less likely to leave their then-

current processors to do business with Merchant Lynx.  Instead, Merchant Lynx hits merchants with these unanticipated fees after the relationship has commenced and merchants are "locked in".

**E.    Merchant Lynx Tries to Undermine the Established Fee Terms of the Merchant Agreement with 30 Pages of Fine Print**

71.    While merchants agree to a Merchant Agreement consisting of a three-page template outlining the central fee terms, Merchant Lynx claims its Merchant Agreement incorporates an additional terms document entitled "MPA Terms and Conditions" ("Terms") [5]. In other words, through its Terms, Merchant Lynx attempts to undermine all of the negotiated fees established by the parties in the Merchant Agreement.

72.    The small business merchants that contract with Merchant Lynx are not knowledgeable about the ins and outs of credit card processing.  They simply need to accept credit cards as a form of payment.  In this way, while they may be talented at their craft or otherwise generally educated, they are legally unsophisticated in the intricacies of credit card processing. Merchants' inferior position of knowledge and bargaining power renders them susceptible to deception.

73.    Merchant Lynx holds all the cards and information about the credit card processing industry.  Merchant Lynx capitalizes on its superior bargaining strength by purportedly "simplifying" the processing charges for unsophisticated merchants.  In reality, Merchant Lynx

---

[5] "Merchant Lynx MPA Terms and Conditions" located on Merchant Lynx website; accessed 12/4/2022: https://merchantlynx.com/mpa-terms-and-conditions/

uses this "simplification" to mislead merchants into believing they will get the deal in the Merchant Agreement, and then uses the Terms to overcharge merchants

74.     The "MPA Terms and Conditions" is a dense, convoluted 35-page document.  The Terms are non-negotiable.  They are uniform and the same for every Merchant Lynx customer.  These Terms not only include obfuscatory legal and technical language designed to confuse merchants, it also buries within these many pages of legalese unconscionable and exculpatory provisions.

75.     For example, Merchant Lynx claims the Terms allow it to raise fees arbitrarily and without authorization, while, as alleged below, purportedly shielding Merchant Lynx from legal liability for those fee additions and increases.

76.     Fee terms are the crux of the Merchant Lynx contract, are material to the underlying transaction, and would undoubtedly influence a merchant's decision to do business with Merchant Lynx.  For this reason, the Merchant Agreement establishes fixed fee amounts and does not indicate that (a) the agreed-on fees and rates will increase, or that (b) new, undisclosed fees and rates will be charged.

77.     Instead of conspicuously setting forth such allegedly critical provisions in the Merchant Agreement, Merchant Lynx buries terms about changing and adding fees in the separate, fine print, non-negotiable Terms.

78.     Merchant Lynx's Terms are contracts of adhesion.  They are set forth in a standardized, uniform document.  They are the same for all merchants contracting with Merchant Lynx.  The provisions of the Terms are non-negotiable.  Merchants have to either accept or reject the Terms.  In fact, the Terms themselves state in section 7.2(D), "Any alteration or strikeover in

the text of this pre-printed Agreement will have no binding effect, and will not be deemed to amend this Agreement."

79.     Merchants may not even receive a copy of the Terms when they sign the Merchant Agreement.   If not requested specifically by the merchant, neither Merchant Lynx nor its independent sales agent may mention them at all.  Even if they do, they do not provide printed copies, but rather direct the merchant to the Merchant Lynx website where presumably merchants will be able to access the Terms in an electronic format.

80.     And, even if the Terms were provided to merchants, given the dense, convoluted legalese of the Terms, it is highly unlikely that any merchant actually read or understood it.  As Chief Justice John Roberts, Judge Richard Posner, and other federal judges have pointed out, they do not read—and are aware that no one reads—fine print form contracts.[6]

81.     Merchant Lynx uses the Terms, as well as its high early termination fee, as tools to deter aggrieved merchants from terminating their relationships with Merchant Lynx or pursuing legal action for overcharges or unauthorized fees.  These Terms represent Merchant Lynx's attempt to secretly backtrack from the rates and fees prominently set forth in the Merchant Agreement and immunize itself from liability for its unlawful practices.

82.     In a grossly one-side presentation, Merchant Lynx's Terms attempt to take away all of the merchants' rights and give Merchant Lynx unfettered ability to avoid its contractual

---

[6] "Chief Justice Roberts Admits He Doesn't Read the Computer Fine Print," Debra Weiss, *ABA Journal*, Oct. 20, 2010:
https://www.abajournal.com/news/article/chief_justice_roberts_admits_he_doesnt_read_the_computer_fine_print

obligations.  Therein, Merchant Lynx claims it bestows to itself unilateral control to arbitrarily change the rates and fees prominently set forth in the Merchant Agreement while only giving merchants 30 days to uncover its misconduct (or forever waive any right of recovery).  Merchant Lynx further claims that it is immune from any liability associated with its misconduct.  And, Merchant Lynx argues that if a merchant attempts to sue Merchant Lynx for its misconduct that the merchant should pay Merchant Lynx's attorney's fees even if the merchant prevails. Additionally, the Terms (as argued by Merchant Lynx) would preclude merchants from any class or collective relief such that the merchants bound by these Terms would have to invidually sue Merchant Lynx every month there was a one cent overcharge in tens of thousands of suits around the country.   Not surprisingly, if enforced, these Terms would have the practical effect of immunizing Merchant Lynx from any liability because no merchant (or attorney) is going to file tens of thousands of lawsuits for pennies.

### F.    Merchant Lynx Has a Long History of Deception

83.    Merchant Lynx has received numerous public complaints about its sales practices and sales representatives.  Card Payment Options, a credit card processing review website that tracks such complaints, reports that "the majority of these complaints outright accuse the company of being a scam".  Common issues merchants identify purportedly include "nondisclosure of

contract terms, misrepresentation of rates, expensive contracts and equipment leases, aggressive sales tactics, and poor customer service," and most commonly "hidden fees."[7]

84.     Online merchant complaints mirror Maxine Furs' experience:

*"increased my rate from .06 transaction to .26 transaction"*

*"the processing rate is 1.85% but ended with 16%"*

*"The rate they charged Avg. 3.7% while our contract rate is 1.85%"*

*"They lie, they cheat, they steal. My original contract was an enticing 1.7 on MC/VisA.*

*Within 1 year it is 2.75."*

85.     In fact, in 2014, Merchant Lynx was investigated by the Florida Attorney General's Office in response to allegations that it had violated the Florida Deceptive and Unfair Trade Practices Act and engaged in telemarketing without a license.  Merchant Lynx entered an Assurance of Voluntary Compliance and agreed to thirteen specific terms, including providing a complete copy of the terms of service and its "Program Guide" to customers, honoring customer requests to cancel services or for refunds, and clearly and conspicuously disclose rates charged as well as any and all additional applicable fees.  Merchant Lynx also agreed not to debit customer accounts without customer authorization.

---

[7] "Merchant Lynx Services Review," Card Payment Options; accessed Oct. 25, 2022:
https://www.cardpaymentoptions.com/credit-card-pr%E2%80%8Cocessors/merchant-lynx/

## V.     INDIVIDUAL FACTUAL ALLEGATIONS

### A.     Maxine Furs

86.     On October 19, 2020, Maxine Furs entered into a Merchant Agreement with Merchant Lynx for card payment processing services.  The Merchant Agreement was offered by a sales agent, Merchant Supplies Direct ("Merchant Supplies"), that works with and on behalf of Merchant Lynx.

87.     The Merchant Agreement provided the following Fee Schedule setting forth the fee terms that Maxine Furs and Merchant Lynx agreed to:



88.     As stated above, Maxine Furs contracted for a Discount Fee on an Interchange Plus basis at an established 0.60% (or 60 basis points) for both credit card and debit card transactions.   Maxine Furs contracted for a Transaction Fee at an established 5 cents per transaction. Maxine Furs also contracted for additional "Miscellaneous Fees" at the rates identified below:

- • Monthly Minimum Fee ($0)
- • Customer Service Fee ($0)
- • Batch Fee ($0)
- • Chargeback Fee ($35)
- • ACH Retrieval Fee ($15)
- • Govt. Compliance Fee ($4.95)
- • Fee TIN Mismatch Fee ($35)
- • Gateway Fee ($10)
- • PCI Non-compliance Fee ($30)
- • Annual Fee ($159)
- • ACH Reject Fee ($25)
- • Early Termination Fee ($495)
- • Voice Auth Fee ($1.50/transaction)
- • Online Reporting Fee ($15.95)
- • Annual PCI Fee ($159)
- • Wireless Fee ($15)
- • AVS Fee ($0.10)

89.     A few months into the 3-year contract term, Merchant Lynx started unilaterally changing and increasing Maxine Furs' fees identified herein.

90.     Merchant Lynx started imposing higher Discount Fees.  For example, Merchant Lynx increased Maxine Furs' Discount Fees from 0.60% to 0.75% for some transaction types and from 0.60% to 0.85% for other transaction types.  This change is undetectable on Merchant Lynx's invoicing because Merchant Lynx lumps the Pass-through Costs, Processing Fees, and Middleman Fees together in a single total titled "Interchange Fees" such that Maxine Furs could not distinguish between the actual Pass-through Costs from the card brands and the fees imposed by Merchant Lynx.

91.     Similarly, after a few months of honoring the agreed upon Transaction Fee of 5 cents per transaction, Merchant Lynx unilaterally increased the Transaction Fee to 13 cents per transaction.  This change is undetectable on Merchant Lynx's invoicing because Merchant Lynx lumps the Pass-through Costs, Processing Fees, and Middleman Fees together in a single total

titled "V/MC/D Authorization Fee" such that Maxine Furs could not distinguish between the actual Pass-through Costs from the card brands and the fees imposed by Merchant Lynx.

92.     Merchant Lynx also stopped honoring its contractual obligations with regard to the Miscellaneous Fees, charging more than the agreed upon amounts identified in the Merchant Agreement.  For example, Merchant Lynx started charging Maxine Furs $199 for the Annual Fee, instead of the contracted rate of $159.  Merchant Lynx charged Maxine Furs $199 for the PCI Annual Fee, instead of the contracted rated of $159.  Merchant Lynx imposed a $49 fee for PCI Non-Compliance, despite contractual terms that set the rate at $30.  Merchant Lynx charged $25 for a "Wireless fee", a markup of $10 from the agreed upon $15 rate.  Merchant Lynx also charged AVS fees in excess of the $0.10 contracted rate.

93.     Merchant Lynx also charged fees that were not identified or disclosed in the Merchant Agreement.  These include but may not be limited to a "regulatory fee".

94.     Maxine Furs was also charged various unauthorized fees by Merchant Lynx in combination with independent sales agent Merchant Supplies.  From November 2020 to February 2021, Maxine Furs was charged $19.99/month, an amount that was debited from its accounts without explanation or authorization.   In March 2021, Maxine Furs was again charged $19.99 with an annotation that it originated from Merchant Supplies, but was also charged an additional $19.00 with an annotation that it originated from Merchant Lynx and identified as "INTERNET PAYMENT WEB PMTS."

95.     In April 2021, Maxine Furs was again charged the same "INTERNET PAYMENT WEB PMTS " $19 fee.  Then in May 2021, Maxine Furs was charged the $19 "INTERNET PAYMENT WEB PMTS " fee, *and* another $99.00 with an annotation related to Merchant

Supplies.   From June 2021 to April 2022, Merchant Lynx continued to charge Maxine Furs the $19.00 "INTERNET PAYMENT WEB PMTS" fee.

96.     Maxine Furs never agreed to the "INTERNET PAYMENT WEB PMTS" fee and the fee is not listed in the Merchant Agreement or Terms.  Maxine Furs does not have a contract with Merchant Supplies, did not agree to share its bank account information with Merchant Supplies, and did not authorize Merchant Supplies to debit its accounts.  Thus, references to Merchant Supplies on these debits and/or references to Merchant Supplies' fee can only be a product of Merchant Lynx's access to Plaintiff's banking information and accounts.  While Merchant Lynx may claim that Merchant Supplies provides equipment insurance, Plaintiff already had equipment insurance and therefore did not and would not have authorized additional fees for insurance from Merchant Supplies.

### B.     The Anticipated Defenses Have No Merit

<u>Voluntary Payment</u>

97.     Defendant may respond by claiming that Plaintiff voluntarily paid the charges of which they now complain, and recovery is thus barred by the voluntary payment doctrine. However, the voluntary payment doctrine does not apply.

98.     Upon information and belief, Plaintiff was not given statements itemizing all charges.  It cannot possibly be said that Plaintiff voluntarily paid charges of which it was given no notice.

99.     As for the statements Plaintiff did receive, by the time Plaintiff received them, Defendant had already seized the charges noted therein from Plaintiff's bank accounts.  This is Defendant's general practice – to send statements so that merchant customers do not receive them until *after* Defendant is already in possession of the fees.  Because Defendant takes the fees *before*

merchants are notified or have a reasonable opportunity to understand how they were computed, it cannot be said that Plaintiff has "voluntarily" paid them with full knowledge of the facts.

100.    Even if Plaintiff had received the statements in a timely fashion, this is not a simple case where readily accessible information would have easily put Plaintiff on notice for overcharges.

101.    First, the statements do not separately identify Pass-through Fees from the Middleman Fees imposed solely by Defendant – such line items are bundled together.  Thus, determining whether a fee should be checked against the Merchant Agreement or the Pass-through fee schedules published by the card networks is often impossible.  Moreover, a single credit card transaction often involves many different fees, making it even more difficult to determine whether a merchant has been overcharged for Pass-through Fees.  These difficulties are further complicated by the fact that the fee codes on the statements are often given different names than those set forth in the Merchant Agreement and the card brand fee schedules.

102.    Even if it can be said that Plaintiffs had the duty and capability to perform this onerous investigation in response to each and every monthly statement they ever received (an assertion Plaintiff denies), failure to do so before the paying the subject amounts was, at worse, due to negligence or a lack of diligence.  Payments made under such circumstance can be recovered because it would not prejudice Defendant, which makes millions in profits every year, to return these unearned and unauthorized overcharges it unilaterally and secretly imposed.

30-Day Notice Provision

103.    Merchant Lynx may attempt to invoke Section 3.1(C) of the Terms that states:

C. Asserted Errors. Merchant must promptly examine all statements relating to the Designated Account, and immediately notify Service Provider in writing of any asserted errors. Merchant's written notice must include: (i) Merchant name and

account number; (ii) the dollar amount of the asserted error, (iii) a description of the asserted error; and (iv) an explanation of why Merchant believes an error exists and the cause of it, if known. That written notice must be received by Service Provider within 30 calendar days after Merchant receives the periodic statement containing the asserted error. Merchant's failure to notify Service Provider of any error within thirty (30) days constitutes a waiver of any claim relating to that error. Merchant may not make any claim against Service Provider relating to any asserted error for 60 calendar days immediately following Service Provider's receipt of Merchant's written notice. During that 60-day period, Service Provider will be entitled to investigate the asserted error.

104.    This provision is inapplicable for multiple reasons.  First, the term "error" as used herein clearly refers to factual mistakes that are best addressed while information and facts are easily remembered.   This case does not address mistakes at all, but rather only Merchant Lynx's willful efforts to improperly raise fees and impose new authorized fees for its own financial gain. Unlike a mistaken transaction – where a customer was charged $100 rather than $10, for example – Merchant's Lynx's intentional and systematic markups and overcharges can be dealt with after-the-fact without any undue prejudice to Defendant.

105.    Indeed, interpreting the 30-day notice provision more broadly to include Defendant's systematic overcharges within the scope of the term "error" would only serve to exculpate Merchant Lynx from liability if merchants failed to "catch it in the act" immediately after the overbilling occurs.

106.    Moreover, the provision requires the merchant to state (1) the dollar amount of the asserted error, (2) a description of the asserted error, and (3) an explanation of why Merchant believes an error exists and the cause of it.  This information could only be provided if the merchant detected the specific amount of the overcharges and knew why the overcharge was imposed.  As indicated above, merchants were precluded by Defendant's deceptive practices and

cryptic statements from detecting that they were being overcharged, the amount of the overcharge, and why and how the overcharges were being imposed.

107.    In addition to being an unreasonably short timeframe, Defendant cannot properly cram and bury improper charges under these circumstances and then try to use the notice provision as a shield against liability for their willfully deceptive and unfair conduct.

108.    Regardless, the 30-day notice provision is an unconscionable exculpatory clause in that the notice requirements attempt to limit the merchants' rights to a 30-day statute of limitation.

109.    Exculpatory clauses are contractual provisions severely restricting remedies or waiving substantial rights.  Here, the written notice provision, if interpreted as Defendant is likely to suggest, would severely restrict remedies and insulate Defendant from liability and is thus an exculpatory clause.

110.    To be enforceable, the written notice provision must be explicit, prominent, clear, and unambiguous.  There is nothing about this provision that effectively and sufficiently distinguished it from the dozens of other provisions in the 35 pages of lengthy, small-type Terms. Rather it is buried in the middle of the Terms.  No portion of the text is capitalized, there is separate typeface or size, there is no separate heading, and it is not located around related provisions.  The provision was effectively designed to draw as little attention as possible and is buried in a section titled "Designed Account."  It is thus unenforceable.

111.    The 90-day notice provision is also unconscionable. Indeed, the process by which Defendant "made" its contracts with Plaintiff is unconscionable. Defendant is a large merchant acquirer while Plaintiff is a small, "mom and pop"-type merchant. Merchants must accept debit and credit cards to make themselves competitive in the marketplace and thus must use a payment

processing service. They are thus at the mercy of companies such as Defendant that can connect them to these services.   Defendant is in a position of superior bargaining power.  Defendant has taken full advantage of this fact by imposing the decidedly one-sided Terms on Plaintiff without negotiation or the ability to "opt out" of disfavored provisions.  This "take-it-or-leave-it" process meant Plaintiff was forced to accept the separate Terms as-is. Moreover, on its face the written notice provision is inconspicuous and difficult to comprehend. Under these circumstances, the subject provision is procedurally unconscionable.

112.    Moreover, the small amounts at issue that are often framed and contracted for in cents or basis points (one hundredth of one percent) providing a setting in which the disputes predictably involve small amounts of overcharges and damages resulting therefrom.  It is this system of small, systematic and incremental overcharges that Defendant capitalizes on to take advantage of merchants and perpetrate its willful scheme.  Here, Defendant has deliberately imposed overcharges in small amounts over a long period of time to cheat thousands of merchants out of their money.  While the overcharge amounts are small on an individual basis, when applied across Merchant Lynx's large portfolio, Defendant profits in the millions.

113.    The written notice provision is substantively unconscionable because, if enforced in a strained manner that may be suggested by Merchant Lynx, it would be grossly unfair in that it would have the practical effect of condoning Defendant's intentional overbilling practices.  There are many problems with the misleading statements, which given their form and the generally confusing nature of the card processing system, do not effectively place merchants on notice that they are being overbilled.  It would be grossly unfair to expect merchants to "eat" their losses if they don't even realize they are being overbilled.  A fair-minded man would never agree to such a restriction.

Class Action Waiver

114.     Defendant may attempt to make use of Section 6.1(B) of the Terms which states in relevant part:

> Merchant Lynx Services, , [sic] Member, and Merchant agree that any and all disputes or controversies of any nature whatsoever (whether in contract, tort or otherwise) arising out, relating to, or in connection with (a) this Card Services Agreement, (b) the relationships which result from this Card Services Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Card Services Agreement, … and shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties.

115.     This "class waiver" is unconscionable.  It is procedurally unconscionable given that it is a contract of adhesion.  It is substantively unconscionable because it is grossly unfair in that (if enforced) would allow Defendant to steal small amounts with impunity.

116.     More specifically, the terms are buried in a 35-page adhesion contract.  The Merchant Agreement and relationships at issue predictably involve small amounts, here fee overcharges measured in cents and basis points (one hundredth of one percent).  Merchant Lynx is in a superior bargaining position than small business merchants who have little to no knowledge about credit card processing.  Merchant Lynx has used its position of superiority to willfully and intentionally cheat large numbers of merchants out of small amounts of money.  Enforcing a class waiver under these circumstances would effectively deny Plaintiff and all other business merchants who use Merchant Lynx a remedy because it would make no economic sense for Plaintiff or other merchants to proceed against Merchant Lynx on an individual basis given the amounts in controversy.

117.     Because the Terms purportedly do not allow Plaintiff to recover attorneys' fees if its claims are vindicated (6.1(B)) and may limit what Plaintiff can recover (3.1(C)), and

purportedly requires Plaintiff to pay other parties' legal fees and costs regardless of the outcome (6.1(B)), the costs of litigating the case to conclusion (if these terms were enforceable) would far outweigh the potential damages at stake.

118.     Thus, the only practical way to remedy Defendant's small-value overbilling is by a class action.

119.     In this way, the class waiver acts as an exculpatory clause because it severely restricts, if not eliminates, Plaintiff's remedies and thus effectively insulates Defendant from liability. Indeed, if merchants are forced to seek relief on an individual basis, it would make no economic sense for them to proceed with this case. Because the contract purportedly does not allow Plaintiffs to recover attorneys' fees if their claims are vindicated and may limit what Plaintiffs can recover (Terms, § 6.1, 3.1), the costs of litigating the case to conclusion would far outweigh the potential damages at stake. Thus, the only practical way to remedy Defendant's small-value overbilling is by a class action. *See generally Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30").

120.     The class action waiver is also an improper exculpatory clause because (a) it is not explicit, prominent, clear, and unambiguous and (b) Plaintiff alleges Defendant's overcharges were imposed willfully and wantonly, as opposed to via mistake or negligence.

121.     Also, the class waiver is one-sided.  Defendant would never want to or have the ability to seek class relief against an individual or group of merchants.  It is only the merchants that the class waiver impacts, and, in this setting, enforcement would preclude merchants from having any recourse for Defendant's misconduct.

Ability to Amend Agreement and Alter Fees/Rates

122.     Defendant may attempt to defend its conduct by arguing that it had the contractual discretion to amend the agreement, increase fees or impose new fee categories. *See* Terms, Section 3.5(A), (D), and 7.2(F).

123.     These terms do not give Defendant the right to unilaterally change its own performance obligations (honoring the fees and associated rates) at any time, as such an interpretation would render the contract illusory.

124.     These provisions are unconscionable and unenforceable.   The Merchant Agreement requires Merchant Lynx to connect the merchant to processing services in exchange for a set price for a 3-year period.  If the Terms then afforded Merchant Lynx complete discretion over increasing that price whenever Defendant wanted and however much Defendant wanted, no sane person would agree to contract with Merchant Lynx.  Also, if that is the meaning of the terms, they are void for vagueness, illusory, and lack mutuality.

125.     Even if the contract did not limit discretionary fee increases, good faith and fair dealing constrains Defendant's ability to use discretion to increase fees in ways which were not contemplated by the parties. For example, although a contract may leave discretion to increase a fee, and thereby profit one party to the other party's detriment, good faith and fair dealing precludes such conduct unless increased costs have necessitated the increase.

126.     Thus, even if its purported ability to change rates is enforceable, Merchant Lynx is bound to exercise its contractual discretion in good faith.  Defendant's manipulation of Plaintiff's fees and charges was not done in response to actual cost increases.  Such unilateral mark-ups to agreed-upon rates do not comport with good faith and fair dealing.

127.     Defendant may also argue that its billing manipulations are proper because it provided

merchants with advance notice of some changes. However, it remains uncertain whether merchants were provided with advance notice of the fee increases and new charges.  And even if merchants had notice, they were forced to either accept the overbilling or pay a hefty early termination fee. Maxine Furs was not provided with advance notice that Merchant Lynx would be unilaterally increasing the Middleman Markup Fees at any time during her contract with Merchant Lynx. Moreover, the form, format, and content of the statement notices given by Merchant Lynx for some of the charges at issue were insufficient to provide merchants with actual notice of the increases and were therefore ineffective.

128.    Terms that allow defendant to "unilaterally change the terms or terminate the contract at will" are evidence of "overwhelming" substantive unconscionability.  The provisions are substantively unconscionable because they are grossly unfair.  Indeed, no reasonable merchant would agree to a provision that allows an ISO to disregard all agreed-upon pricing considerations (i.e., the considerations which induced the merchant to do business with the processor in the first place) and charge whatever, whenever, and for whatever reasons it wants.

129.    To the extent these terms are enforceable, they are limited in their application including but not limited to some or all of the following:

(1) Amendments are only permissible "due to changes in [] Card Association's fees, interchange, and assessments" that are applicable to the merchant's account;

(2) Amendments are only permissible "in order to conform and comply with any amendments or modifications of the Rules or law". Rules is defined as "the rules and regulations of any Card Association or Debit Network, as amended from time to time.";

(3) Changes to fees can only occur when increases are imposed by the card brands in the form of increases to Pass-through Costs, and then must only be increased in the amount imposed

by the card brands;

(4) Changes to fees can only be made when there are "additional services utilized by Merchant" such that if the merchant does not use "additional" services from those identified in the Merchant Agreement, additional fees cannot be charged;

(5) "Service Provider", a term that includes the Bank, must approve the fees and participate in the adjustment of the fees, such that Merchant Lynx cannot act unilaterally;

(6) "written notice" must be provided to the merchant which assuming a duty of good faith and fair dealing requires that the information in the notice will be true, accurate, and clearly state the reason for an such modification from the contracted terms;

(7) Merchants must be given the opportunity to reject any fee increases or additions without penalty; and/or

(8) The written notice must be mailed to the merchant.

Limitation of Liability

130.    Merchant Lynx may argue that Plaintiff's damages are limited to one month of overcharges.  However, the "limitation of liability" provision contained in Article VI, Section 6.1 of the Terms, upon which Defendant would rely, is unconscionable and/or an exculpatory clause, because, if enforced, it would have the practical effect of immunizing Defendant from liability.

131.    Merchants such as Maxine Furs simply cannot afford to pay attorneys to pursue only one month's worth of overcharges, which if enforced, would be the practical effect of enforcing this provision.  Attorneys have no incentive to take such cases on a contingency basis and no honest person would expect another to take on most of their losses if a breach of contract

were proven.  It would be grossly unfair to expect merchants to "eat" the vast majority of their losses if a breach of contract is proven.

132.    Moreover, pursuant to California Civil Code Section 1668, "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Thus, Merchant Lynx cannot immunize itself from liability from fraudulent conduct, willful injury or violations of a statute.

133.    California Courts have long held that "[a]n agreement insulating one from liability for his own negligence must specifically so provide and is strictly construed against the party asserting the exemption, especially where he is the author of the agreement." *Viotti v. Giomi,* 230 Cal. App. 2d 730, 739, 41 Cal. Rptr. 345 (1964)). "An agreement which seeks to limit generally without mentioning negligence is construed to shield a party only for passive negligence, not for active negligence." *Burnett v. Chimney Sweep*, 123 Cal. App. 4th 1057, 1066, 20 Cal. Rptr. 3d 562 (2004).  Here, the limitation of liability clause does not expressly reference negligence.  And the conduct demonstrated by Merchant Lynx is willful and intention misconduct, not passive negligence.  Thus, the limitation of liability clause cannot shield Defendant from its misconduct here.

## V. CLASS ALLEGATIONS

134.    Plaintiff brings this action against Defendant on behalf of itself and all others similarly situated.  The Class is preliminarily defined as

> All merchants in the United States who paid a fee or charge to Defendant that differs from those set forth in the "Merchant Application and Agreement."
> Such persons shall be referred to as "Class members" or "class members."

135.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.

136.    Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all merchants who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

137.    The time period for the Class is the number of years immediately preceding the date on which the Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

138.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

139.    *Numerosity*.  The members of the Class are so numerous that individual joinder of all the members is impracticable.  On information and belief, there are tens of thousands of merchants that have been damaged by Defendant's wrongful conduct as alleged herein.  The precise number of Class members and their addresses is presently unknown to Plaintiff, but can readily be ascertained from Merchant Lynx's books and records.  Class members may be notified

of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

140.     *Commonality and Predominance*.  Numerous common questions of law and fact exist as to the claims of Plaintiff and the other Class members.  Such questions include, but are not limited to:

(a) Whether Defendant has breached its contracts with Plaintiff and the other Class members, either directly or via the covenant of good faith and fair dealing;

(b) Whether Defendant is liable to Plaintiff and the other Class members for imposing unauthorized fees on merchants for Defendant's own benefit;

(c) Whether certain of the Terms are invalid exculpatory clauses, violate public policy, are illusory, lack mutuality, are procedurally and substantively unconscionable, and are otherwise void and unenforceable;

(d) Whether Defendant unfairly, unlawfully and/or deceptively failed to provide class members all pages of operative agreements (including documents incorporated by reference);

(e) Whether Defendant violated Cal. Bus. & Prof. Code § 17200;

(f) The amount of revenues and profits Defendant received and/or the amount of monies or other obligations lost by Class members as a result of such wrongdoing;

(g) Whether Class members are entitled to declaratory, injunctive and other equitable relief and, if so, what is the nature of such relief; and

(h) Whether Class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

141.     Defendant has engaged in a common course of conduct toward Plaintiff and the other Class members.  The common issues arising from this conduct that affects Plaintiff and the

other Class members predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

142.   *Typicality*.  Plaintiff's claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories.  Further, Plaintiff and members of the Class were comparably injured through the uniform misconduct described above.

143.   *Adequacy of Representation*.  Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other Class members; Plaintiff has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiff and its counsel.

144.   *Declaratory and Injunctive Relief*.  Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.  Specifically, Defendant continues to knowingly overbill the Class and attempts to enforce unconscionable or otherwise unenforceable contractual provisions to block the Class members from seeking legal relief.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

145.   *Superiority*.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendant, thus rendering it impracticable for Class members to individually seek redress for Defendant's wrongful conduct.

Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII. **CLAIMS FOR RELIEF**

### COUNT ONE
**Breach of Contract and**
**Breach of the Covenant of Good Faith and Fair Dealing**

146.    Plaintiff realleges and incorporates by reference paragraphs 1 through 145 above.

147.    The actions taken by Merchant Lynx have materially violated the specific terms of its form Merchant Agreement.

148.    Further, Merchant Lynx has breached the contract by violating the covenant of good faith and fair dealing. Merchant Lynx is liable for the losses of Plaintiff and the Class that have resulted from its breaches of contract.

149.    Merchant Lynx violated the contract by assessing charges not provided for in the fee schedule in the Merchant Agreement and by unilaterally marking up agreed-on fees and charges without proper basis, if not contractually-required notice. Furthermore, Merchant Lynx has assessed other fees in the guise of "pass through" fees from the card associations which are actually retained by Merchant Lynx. Thus, Merchant Lynx has materially breached the express terms of its own form contract.

150.    Plaintiff and the Class have performed all, or substantially all, of the conditions precedent imposed on them under the contracts.

151.    Plaintiff and the Class sustained damages as a result of Merchant Lynx's breaches

of contract.

152.    California law imposes upon each party to a contract the duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

153.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

154.    By charging fees that are inconsistent with those laid out in the contract, including but not limited to, increasing the amounts of agreed-on fees and imposing new categories of fees not referenced in the contract, Merchant Lynx has violated the spirit of the contract and breached the covenant of good faith and fair dealing.  Even if Defendant believed that it had given itself contractual discretion to increase mark-ups and fees, or add new fees, such discretion is constrained by the covenant of good faith and fair dealing and Merchant Lynx's actions do not comport with this duty.

155.    Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the contract.  There is no legitimate excuse or defense for Merchant Lynx's conduct.

156.    Merchant Lynx's anticipated attempts to defend its overbilling through reliance on contractual provisions in the Terms and elsewhere will be without merit.  Such provisions are

either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, and are procedurally and substantively unconscionable, among other reasons.  These provisions do not excuse Merchant Lynx's breaches or otherwise preclude Plaintiff and the Class from recovering for such breaches.

157.    Plaintiff and members of the Class sustained damages as a result of Merchant Lynx's direct breaches of the contract and Merchant Lynx's breaches of the covenant of good faith and fair dealing.

**COUNT TWO**
**Unfair, Unlawful, and Deceptive Trade Practices**
**Cal. Bus. & Prof. Code § 17200, et seq.**

158.    Plaintiff realleges and incorporates by reference paragraphs 1 through 157 above.

159.    Within four years preceding the filing of this Complaint, and at all times mentioned herein, Defendant has engaged, and continues to engage, in unfair, unlawful and deceptive trade practices in California by engaging in the unfair, deceptive and unlawful business practices outlined in this Complaint.  In particular, Defendant has engaged, and continues to engage, in unfair, unlawful and deceptive trade practices by:

(a) failing to inform class members, or concealing from class members the fact that, they would be charged undisclosed, unauthorized, and arbitrary rates and fee hikes;

(b) deceiving class members into believing that (1) the Merchant Agreement contained all the rate and fee terms and conditions and (2) class members would be charged a "flat rate" or cost-competitive rate or credit card processing services as set forth on the Merchant Agreement;

(c) failing to properly inform merchants of the complete contract terms;

(d) sharing bank account information with Merchant Supplies Direct, a non-party to the

CLASS ACTION COMPLAINT

contract between Plaintiff and Defendant;

(e)  acting in breach of contract; and

(f)  acting in breach of the duty of good faith and fair dealing.

160.    Plaintiff and those similarly situated relied to their detriment on Defendant's unfair, deceptive, and unlawful business practices.

161.    Defendant's acts and omissions are likely to deceive the general public.

162.    Defendant engages in these unfair practices to increase its profits.  Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, et seq. of the California Business and Professions Code.

163.    The aforementioned practices, which Defendant has used, and continues to use, to its significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Defendant's competitors as well as injury to the general public.  Defendant purports to offer more competitive, "flat rate" contracts with merchants to secure their business when, in truth, Defendant reaps outsized profits at the expense of merchants from overcharges, unauthorized, undisclosed rate hikes, and arbitrary fees.

164.    Plaintiff seeks, on behalf of those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon.

165.    Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit Defendant from continuing to engage in the unfair trade practices complained of herein.  The acts complained of herein occurred, at least in part, within four years preceding the filing of this

Complaint.

166.    Plaintiff and those similarly situated are further entitled to and do seek both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent and injunctive relief restraining Defendant from engaging in any of such deceptive, unfair and/or unlawful trade practices in the future.  Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to merchants, and the general public, and the loss of money and property in that the Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future merchants to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which Defendant is not entitled. Plaintiff, those similarly situated and/or other merchants or consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

167.    As a direct and proximate result of such actions, Plaintiff and the other members of the Class have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.  Among other things, Plaintiff and the Class lost the portion of the amounts paid for debit and credit card processing services that was higher than what appeared on the Merchant Agreement.

168.    As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which

is in excess of the jurisdictional minimum of this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the proposed Class demand a jury trial on all claims so triable and judgment as follows:

(1) Certifying this case as a class action pursuant to Federal Rule 23, including appointment of Plaintiff as Class Representative and its counsel as Class Counsel;

(2) Temporarily and permanently enjoining Defendant from continuing the improper business practices alleged herein;

(3) Declaring certain contractual provisions to be unenforceable and enjoining their enforcement;

(4) Awarding restitution of all improper fees seized by Defendant from Plaintiff and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

(5) An order requiring Defendant to return all sums obtained from Plaintiff and the other Class members as a result of its unlawful, deceptive, misleading, and unfair business practices;

(6) Awarding damages in an amount to be determined by a jury;

(7) Awarding compensatory, general, nominal, punitive, and exemplary damages, as allowed by law;

(8) Awarding pre- and post-judgment interest at the maximum rate permitted; and

(9) Awarding attorneys fees, costs, and such other relief as this Court deems just and proper.

Dated: February 14, 2023

Respectfully submitted,

By: */s/ Austin Brane*

Austin Brane

**WAGSTAFF & CARTMELL**
Austin Brane (SBN 286227)
Mike Cutler (SBN 270663)
4740 Grand Ave., Suite 300
Kansas City, MO 64112
(816) 701-1100
abrane@wcllp.com
mcutler@wcllp.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

**FILER'S ATTESTATION**

I, Austin Brane, am the ECF User whose ID and password are being used to file this document. In compliance with Civil L.R. 5-1(i)(3), I hereby attest that all counsel has concurred in this filing.

By: */s/ Austin Brane*
Austin Brane